1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3

UNITED STATES OF AMERICA,

4

5                    Plaintiff,

6   vs.                          No.11-CR-1690

7

JOHN A. CROWE,

8

9                    Defendant.

10      _____

11   TRANSCRIPT OF PROCEEDINGS, TESTIMONY OF TAMI LOEHRS

12              MOTION TO SUPPRESS

13      _____

14              May 10, 2012
                 4:46 p.m.
15

HEARD BEFORE:  HONORABLE MARTHA VAZQUEZ
16                United States District Judge
                 Santa Fe, New Mexico
17

18

19              A P P E A R A N C E S

20   For the Plaintiff: Charlyn Rees, AUSA
                        Raul Torrez, AUSA
21

22   For the Defendant: Jon Paul Rion, Esq.

23

24

25

```
1                    I N D E X

2                                        Page

3                W I T N E S S E S

4  Tami Loehrs
```

```
5      Direct Examination by Mr. Rion      3

6      Cross-Examination by Ms. Rees       28

7      Redirect Examination by Mr. Rion    47

8

9  Reporter's Certificate                  52
```

```
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  You may call your witness.

 2              MR. TORREZ:  Government rests.

 3              THE COURT:  I'm sorry.  I just assumed you

 4    rested because you told me you had two witnesses.

 5              MR. RION:  How does the Court wish to proceed?

 6    To simply get through the hearing?

 7              THE COURT:  Yes.

 8              MR. RION:  However late it goes?

 9              THE COURT:  I presume you're not going to keep

10    me here until midnight.

11              MR. RION:  No, but I would anticipate this

12    witness is going to take a couple of hours to get

13    through.  It's essentially that it's our expert, so we're

14    going through the same information.

15              THE COURT:  Well, let's get started.

16              MR. RION:  Okay.  Good afternoon.  Please be

17    seated.

18                      TAMI LOEHRS

19    having been sworn, testified under oath as follows:

20                   DIRECT EXAMINATION

21    BY MR. RION:

22        Q.   State your name, please.

23        A.   Tami Loehrs.

24        Q.   And your occupation?

25        A.   I'm a computer forensics expert and the owner
```

1  of Loehrs and Associates, a computer forensics company in

2  Tucson, Arizona.

3          THE COURT:  Excuse me.  I'm sorry to interrupt

4  you right from the beginning, but I'm going to have to

5  ask you to please slow down and, if you could, speak into

6  the microphone.  Our court reporter has been at this all

7  day long, and she would appreciate it if you could be a

8  little slower than our previous witness.  Thank you.

9          THE WITNESS:  Okay.

10  Q.    (Mr. Rion) :  How many years have you been in

11  the field of computer forensics?

12      A.    13.

13      Q.    And what is your training?

14      A.    I have a bachelor of science in information

15  systems.  I have hundreds of hours of specific computer

16  forensics training.  I am EnCase certified.  I'm FTK

17  certified.  I'm a certified hacking forensic expert, and

18  I am a certified computer forensic expert.

19      Q.    And have you -- how many cases have you looked

20  at during your career?

21      A.    Somewhere around 300, 400.

22      Q.    And have you testified in a court of law prior

23  to this?

24      A.    Approximately 60 times in state and federal

25  courts throughout the United States and Puerto Rico.

1      Q.   And has your testimony always been on the issue

2  of computer forensics?

3      A.   Yes.

4      Q.   Other than your education and then your

5  certifications that you received, have you participated

6  in any type of writings or speakings or anything of that

7  nature?

8      A.   Yes.  I've given presentations for years, again

9  all over the country, to various organizations on

10 computer forensics.

11     Q.   And specifically as it relates to peer-to-peer

12 programs, what is your training and experience as relates

13 to that field?

14     A.   I have actually been testing and researching

15 peer-to-peer software based on cases -- I've had

16 peer-to-peer cases since I think as early as 2004, 2005.

17 So we've been testing peer-to-peer software to see how it

18 performs doing forensic exams on cases that involve

19 peer-to-peer investigations, and comparing the forensic

20 findings with the software and how it works.

21          I have prepared affidavits regarding some

22 issues that we found, and testified in hearings regarding

23 this issue.

24     Q.   And you've testified a little bit about some of

25 the qualifications or certifications that you've had.

1  Are any of those certifications related to peer-to-peer

2  software programs?

3        A.    Not specifically to peer-to-peer, no.

4        Q.    But to file programs in general?

5        A.    Well, to forensics.  I mean, some of the

6  training that I've received involves peer-to-peer file

7  sharing.

8        Q.    You said EnCase.  Is that something that

9  reviews images and text that would be stored on a

10 computer?

11       A.    Yes, EnCase is.  I think it's the world leader

12 in forensic tools.  It's a piece of software that allows

13 us to conduct a forensic examination, recover things from

14 unallocated space, things that a normal user would not be

15 able to access.

16       Q.    And to be EnCase certified, what types of

17 procedures do you have to go through?

18       A.    I took courses with EnCase, had to be approved

19 to take their certification process, then you have to

20 pass a written test; I think you have to score 80% or

21 higher.  Then they send you a practical exam, where you

22 actually conduct a forensic exam, answer some questions.

23 You get graded on that.  Once you become certified, you

24 have to continue to get education credits to maintain

25 your certification.

```
1        Q.   And the other certifications that you have, do
2    they relate specifically to forensics, as well?
3        A.   Yes.  FTK is the second-leading forensic tool
4    used throughout the world.  Very similar process in
5    getting certified:  A written test, a practical exam.
6             MR. RION:  Your Honor, at this time I would
7    tender this witness as an expert in the field of forensic
8    computer forensics.
9             THE COURT:  Any objection?
10            MS. REES:  No, Your Honor.
11            THE COURT:  All right.  She will be so accepted
12   by this Court.
13   Q.   (Mr. Rion) :  In this case, were you asked to
14   view various documents and then draw some
15   conclusions from them?
16       A.   Yes.
17       Q.   And as part of that, did you actually come to
18   Santa Fe or to Albuquerque and actually view the computer
19   for multiple days to try to determine the substance of
20   what's on this computer and how it got there?
21       A.   Yes.  I conducted a preliminary forensics exam
22   on the computer in Albuquerque.
23       Q.   I want to start with really the software that's
24   involved in these programs, and the necessity of them for
25   a complete analysis.
```

1              Tell me how available is this Shareaza,

2    depending on how you want to pronounce it, Shareaza LE

3    software, how available is that to you as a forensic

4    analyst?

5         A.   It is not available to me.  It's available only

6    to law enforcement.

7         Q.   And so if you wanted to simply analyze the

8    software itself, would you be able to do so absent a

9    court order or the consent of the government?

10        A.   No.

11        Q.   There's been also some testimony about some

12   other programs such as GnuWatch and Peer Spectre.

13   Generally, what do you know of those?

14        A.   Well, Peer Spectre -- and I'm kind of confused

15   because it seems that GnuWatch is the same thing as Peer

16   Spectre, they just changed the name, because it used to

17   be referred to as Peer Spectre.  And my understanding is

18   that software monitors the Gnutella network for SHA

19   values and file names, and simply creates lists of these

20   file names and SHA values at IP addresses around the

21   world.

22             I have been -- I don't know how Peer Spectre

23   works because I have been unable to test it.

24        Q.   And is Peer Spectre and GnuWatch, however you

25   want to pronounce it, are they also programs that you, as

1   a private citizen, are not -- do not have access to?

2        A.   That's correct.

3        Q.   And, absent a court order or the government

4   consenting, would you be able to analyze the metadata or

5   the programming or any of the source codes to make a

6   determination how it works?

7        A.   No, I would not.

8        Q.   Do you have concerns that -- now today you

9   heard about two other groups using maybe even unknown

10  information.  There's a group called CPS and another

11  group that's also utilizing various softwares to then

12  view people's computers at some level.

13       A.   I believe they referred to TLO.

14       Q.   And have you ever had an experience where

15  either TLO or CPS would simply share the processes that

16  they go through to gain information on people to generate

17  cases such as this?

18       A.   I have not heard of those two until this case.

19       Q.   Now, do you have concerns -- let's start this

20  way.  Is software, whether it's government or private,

21  let's just say government, software in general, does it

22  have the ability to go into private spaces of a person's

23  computer?

24       A.   Software has the ability to do whatever the

25  programmer programs it to do.  So, if a programmer

1  programs the software to go into a private space, then

2  yes, it would have that ability.

3      Q.   And is there software that could be created

4  that could have the ability to go not only into -- well,

5  to search e-mails, to go into peer-to-peer sharing

6  spaces, into private downloaded areas, anything in your

7  hard drive, is there software that's able to get into

8  those areas, absent firewalls and things like that?

9      A.   Sure.  I mean, again, I don't know any specific

10 piece of software you're referring to, but it's --

11 software is simply programming code that tells it what to

12 do.  So any -- it's like no different than what a virus

13 is programmed to go into a computer.  Software is based

14 on what the programmer designs it to do.

15     Q.   And what is it that goes into the computer, if

16 you will, for noncomputer people?  If a software program

17 is designed to go and search a person's computer, what is

18 it that's going into the computer?

19     A.   Well, it's depends on the piece of software.

20 But software is, it's machine code.  It's talking to

21 other pieces of software and machine language.  It's not

22 what the user sees.

23          So, you know, just using something like Peer

24 Spectre as an example, part of the reason I have these

25 issues is because I have worked on cases where Peer

1   Spectre has identified file names and SHA values of files

2   that had already been deleted when Peer Spectre

3   identified them as being on a computer, which leads me to

4   believe that the software isn't looking at the actual

5   file that exists, it's going into the system files of the

6   file-sharing software and reading information that may

7   not have been updated yet, that's not accurate, because

8   the software doesn't constantly update and correct

9   itself.

10          So, inaccurate information may be sitting on a

11  user's computer that this software is coming in and

12  reading, and it's not what actually exists at the time.

13      Q.   And if the testimony of prior experts is that

14  their belief is that Shareaza and things like that, if a

15  file is deleted, doesn't go past -- it's not on a browser

16  list, and that that information is being gained, is it

17  from the system file or something deeper in the computer,

18  as a possibility?

19      A.   Well, again, it's -- this is all scientific.

20  It needs to be tested.  It's not about what somebody's

21  belief is.  They believe it's not.  I have found evidence

22  that it does.  So, it's not -- it should be tested.  It's

23  about testing a piece of software and seeing how it

24  performs and what it does.

25      Q.   As to what your specific findings have been,

1   can you tell the Court specifically what was found

2   through your analysis, when and where?

3       A.   I worked on a case in Ohio where Peer Spectre

4   provided a list of IP addresses, or a list of file names,

5   SHA values that were found at a suspect IP address.  When

6   I was able to go and view the evidence, do a forensic

7   exam in that case, I found the files that Peer Spectre

8   had identified on the list, and I was actually able to

9   find the metadata that told me when those files had been

10   deleted, and Peer Spectre reported the files as being

11   shared and I don't know the exact date, let's say

12   March 2nd, and I found metadata showing that file had

13   been deleted on March 1st.  So, there's no way that

14   that file could have existed on the computer when Peer

15   Spectre read it as being available.

16         Now, I know how that happens, because when you

17   delete a file in LimeWire or FrostWire, and I've tested

18   this, it doesn't automatically update the system file

19   that records that file name and that SHA value.  So as a

20   user, I delete a file and the file is gone to me.  But

21   until LimeWire or FrostWire is restarted, the file name

22   still exists on the computer in the system file.

23         So that file name and that SHA value is being

24   read as a file that's available for sharing when in fact

25   it's been deleted.  Now, once the computer is rebooted or

1    the software is restarted, it will clear that list out

2    and it will no longer show up.  The problem is, people

3    don't restart their computers or restart their software

4    sometimes for days, weeks, or months, so this false

5    information sits in the system files and it's being read

6    by the software.

7        Q.   Are system files generally shared files or not?

8        A.   Well, the system file is where the sharing

9    occurs.  It doesn't occur by the file that the user sees

10   on the computer.  It occurs in the system files that are

11   created by the software.  It's happening behind the

12   scenes.  Again, it's computer language talking to

13   computer language, not what we see.

14       Q.   You have concerns that either Peer Spectre or

15   GnuWatch or Shareaza LE, that the programs that's being

16   utilized go beyond the shared space in a computer?

17       A.   I have concerns that not only do they go beyond

18   the shared space -- and when I say the shared space, I

19   guess I would say the space that the user has knowledge

20   of being shared -- but that they produce inaccurate

21   information that the -- of items the user doesn't

22   actually have.

23       Q.   At the time --

24       A.   At the time it's reporting it, exactly.

25       Q.   Which could be -- there's two explanations.

1  The one explanation is that it's going deeper into the

2  deleted space, if you will, or into --

3       A.   It could.  That's the problem, I don't know

4  where the software is going.  I don't know, once it gets

5  to the computer to read this information, I don't know

6  where it's taking the information from.  I don't know if

7  it's taking it from only shared locations.  I don't know.

8            THE COURT:  Excuse me.  Can I ask a question at

9  this point before I get lost?  If it is deleted, then how

10  can it be shared?

11            THE WITNESS:  It can't.  If you tried to

12  download that file, you would see it available.  If you

13  tried to download it, you'd get an error message, you

14  wouldn't be able to download it.  The software can only

15  read the name and the SHA value, so the file isn't

16  physically there.

17            THE COURT:  Then how was it -- I thought the

18  testimony was that the Agent -- is it Pilon?  I don't

19  want to butcher your name, I'm sorry.  How, what is your

20  explanation, then, as an expert, when you heard the

21  testimony that Agent Pilon was able to download it?

22            THE WITNESS:  Once he started using that

23  particular software, yes, what he downloaded was a file

24  that existed.  I don't know if it was a file that was

25  knowingly shared by the user, but that file did exist or

1    he would not have been able to download it.

2            But there were things that happened before that

3    step in the investigation, and that is, files are being

4    identified at an IP address.

5            THE COURT:  I'm sorry to interrupt you.  You

6    may go ahead.

7            MR. RION:  Thank you.

8    Q.    (Mr. Rion) :  Specifically, then, as to -- you

9    did a forensic analysis as relates to this computer

10   as part of Mr. Crowe's case, correct?

11       A.    Yes.  And again I would confirm that is a

12   preliminary analysis, not a complete forensic analysis.

13       Q.    And explain -- do they allow Mr. Crowe's

14   computer to be released to your lab?

15       A.    No, they do not.

16       Q.    Is there actually laws that would prohibit that

17   as a standard, at least, interpretation of laws?

18       A.    Yes.  The Adam Walsh Act has been interpreted

19   that I cannot have that evidence in my lab.

20       Q.    And does that limit your ability to analyze

21   certain things?

22       A.    Severely.

23       Q.    But nonetheless, to some extent, you're able to

24   analyze some things and do so accurately, correct?

25       A.    Absolutely.

1     Q.   Now, in this specific case, you had information

2   from the affidavits for the search warrant as it relates

3   to two images that were allegedly -- they were found by

4   the Shareaza program.  Correct?

5     A.   Correct.

6     Q.   And in your analysis of the computer, did you

7   attempt to find those two titles, images, SHA values,

8   et cetera?

9     A.   I did.

10     Q.   And what was your -- what were the results?

11     A.   Well, the first thing I did was obviously go by

12   the file names and search through allocated space to see

13   if I could find those file names of those files, that

14   they existed as an active file.  I did not find those

15   file names.

16        I actually scrolled through the gallery view of

17   the images that are on the computer, and we're talking

18   50-, 60-, 70,000 images on a computer, to see if I found

19   anything indicative of child pornography that might have

20   been one of those images.  And I did not see anything in

21   that gallery view.

22        So the next step is I go and I ran a key word

23   search through unallocated space for the file names to

24   determine if I could find where the files existed, if

25   they ever existed.  And then I was able to find those

1    file names with the file path of where they were prior to

2    them being deleted.  Now, I didn't get to pull the actual

3    image itself, but I was able to find the file names.

4        Q.   And why wouldn't you be able to pull the actual

5    image itself?

6        A.   Because the key word search goes and finds text

7    fragments.  In order to find the actual image, I would

8    have to run a forensic process called image carving.

9    What that does is it goes through the unallocated space

10   of the computer and finds every instance of a header and

11   a footer that tells it, that's an image.  And it goes

12   through, brings that image back so that I can view it.

13   Those processes take a very long time.  They're very

14   labor-intensive on the computer.  It's very difficult to

15   perform any other tasks while those are being done.

16   Carving files can take days to complete, and I don't have

17   that kind of time.  So, I did not go in and carve those

18   images.

19            Even if I had, I didn't see the images from the

20   undercover investigation.  The images haven't been

21   provided to me.  So if I had gone through this entire

22   carving process and recovered 200,000 images, there's no

23   way I could look through 200,000 images and try to guess

24   which ones were from the undercover investigation.

25       Q.   So, but you were able to find the titles that

1  would have been connected to those images --

2       A.    Correct.

3       Q.    -- at some point?  Now, when you -- did those

4  titles and the paths that were connected with those, the

5  file paths, do they appear to be written over in any way,

6  compromised in any way?

7       A.    No, if they were overwritten, I wouldn't have

8  found them.  So I found them as whole fragments.

9       Q.    And did you -- were you able to make a

10 determination as to where those images were in

11 Mr. Crowe's computer?

12      A.    Yes.  They were under the User's folder.  Under

13 the user called User, and I believe it was then

14 Documents, and FrostWire.

15      Q.    Would that have been in shared space or

16 unshared space from which -- from the path at any time

17 that you could tell?

18      A.    Based on the settings in FrostWire, both the

19 default settings and the settings that I found on

20 Mr. Crowe's computer, the root of the FrostWire folder

21 was not a shared location.  The shared locations were

22 specifically set out and they were actually the default

23 locations, I believe, for the new version and the older

24 version.  But, no, it was not identified as a location

25 that would have been shared.

1    Q.   And is that at any time that had been

2  downloaded and viewed and whatever else happened to that

3  image, was that ever in a shared space that you could see

4  from the file path that you identified?

5    A.   I didn't find any evidence of that, no.

6    Q.   Okay.  And so what can you draw -- can you draw

7  any conclusions to a reasonable degree of computer

8  certainty or scientific certainty as to whether or not

9  those images were ever in a shared space?

10    A.   Based on the forensic evidence I found, those

11  images were not in a shared location.  That's all I can

12  say.  Again, things have been deleted.  But based on the

13  forensic evidence that I uncovered, those files were not

14  in a shared folder.

15    Q.   And neither at the time that you saw them or at

16  any time of their path that you were able to view?

17    A.   I found no evidence of them being in there in

18  the past, correct.

19    Q.   Now, did that cause you some concern as far as

20  the scope in which the Shareaza program goes into a

21  person's computer, then?

22    A.   It causes several concerns, yes, that any

23  file-sharing software that's looking at that computer,

24  how it's getting those files.

25    Q.   And to adequately make a determination as to

1  how it is that that computer program got to that image,

2  what would you need to do?

3      A.   Test the computer program to find out what it's

4  doing.

5      Q.   Is there any other way to do it?

6      A.   Not that I know of.  I mean, that's what we do

7  in forensics.  We test software all the time to determine

8  how it reacts with the computer, what it's doing, what

9  files it's reading, what files it's creating.  That's how

10  we do this work.

11      Q.   Now, in this case, you were hired by us in

12  early spring sometime?

13      A.   Yes.  I believe it was February or March,

14  sometime around there.

15      Q.   And as a result of you being hired, did you

16  then come down here to then view the computers?

17      A.   Yes.

18      Q.   And during that process, from the date you were

19  hired until, frankly, mid-April sometime, did you receive

20  various documents from our office?

21      A.   I did.

22      Q.   And did those documents come at different

23  times?

24      A.   They did.  I got some stuff early on via

25  e-mail.  I got -- I think we had some hard copy stuff

1    sent later on.  But yes, we got them in different pieces.

2        Q.   Okay.  Just to clear it up, in your affidavit,

3    it states that there's no indication that you had that

4    these images had been downloaded.  Now that you've seen

5    more information that we've actually provided to you some

6    time ago, after you wrote your affidavit, what is your

7    opinion on that?

8        A.   Again, to clarify my affidavit, when I said I

9    saw no documentation, what I'm speaking about are log

10   files.  In the past, when files are downloaded from a

11   single source in an undercover investigation, those files

12   are tracked with software that creates logs.  The log

13   file will -- for one file, you may have 20, 30, 40 lines

14   in the log file showing how that file came, how that file

15   was downloaded from the suspect to the undercover

16   computer.

17          Those logs are created by publicly available

18   software that we test.  I've seen the logs, I know

19   they're accurate.  And when I see those logs, there's no

20   question that that file has been downloaded.  In this

21   case, I saw no logs of any downloads whatsoever.  Now, I

22   did see discovery that I believe came in paper form after

23   I prepared my affidavit that I did not see at the time

24   that has some logging in it, but I have never seen those

25   types of logs before.  So, I don't know what to tell you,

1  other than it does appear there's some kind of logging

2  showing files being downloaded but I don't know what

3  created that log.

4      Q.   Fair enough.  Are you able at this time to have

5  an opinion as to whether or not software in this case

6  that was utilized violated the Fourth Amendment?

7      A.   No, not without testing it.

8      Q.   Are you able to have an opinion in this case

9  from what you viewed outside looking in as to at least

10 from a forensic analysis that you've completed as to

11 whether or not there are significant issues raised by

12 your forensic evaluation of the computer as to whether or

13 not the software went beyond the open shared space of the

14 computer?

15     A.   Yes.  There are definitely issues that I think

16 need to be addressed and tested and analyzed more

17 completely.

18     Q.   The computer program in this case -- you were

19 shown, as part of the discovery, a list of -- a file list

20 that was generated in this case, correct?

21     A.   Yes.

22     Q.   And in that case, in that list, did it state

23 who the peer-to-peer network that was being utilized,

24 what that was?

25     A.   The software?

1      Q.   Yes.

2      A.   Yes.  I believe it reported LimeWire 4.21.3.

3      Q.   Okay.  And then when you analyzed the computer

4  from the information that you had, what information did

5  you receive?

6      A.   There was no LimeWire software on the computer.

7  I found FrostWire.

8      Q.   And do you have an explanation?  You've heard

9  testimony about that.  Is there any other explanation, or

10  do you accept that explanation?

11      A.   To be -- again, I don't know.  I don't know why

12  their software reported it as LimeWire.  I do know that

13  LimeWire and FrostWire -- although in FrostWire's screen

14  shot, I think they even showed it in one of their

15  exhibits, FrostWire specifically says it is not related

16  to LimeWire in any way.  If you believe that, then it

17  couldn't possibly call itself LimeWire, if it's not

18  related in any way.

19          I also know from testing that LimeWire, the

20  word "limewire" is actually in the FrostWire code, so

21  there has to be some relation.  But I don't know why they

22  reported LimeWire instead of FrostWire.

23      Q.   Are there various degrees of people's

24  experience with computers?

25      A.   Absolutely.

1     Q.   And when you do a forensic evaluation of a

2    computer, are you able to determine that person's level

3    of sophistication while you're looking at their computer?

4     A.   Actually, yes, we do look for levels of

5    sophistication.

6     Q.   And if you could tell the Court, how is it that

7    you can make those determinations, what you're looking

8    for?

9     A.   People with higher levels of computer knowledge

10    tend to use specific tools.  They may use programs, for

11    example, Internet browsers.  It used to be that everyone

12    used Internet Explorer.  If you were a more advanced

13    user, you've gone out and gotten Firefox.  Different --

14    just different tools that make people appear obviously

15    more advanced with a computer.

16          Actions that have occurred on the computer.

17    Has this person been in the registry, changing things in

18    the registry files?  If somebody is in there running

19    command language through the computer, I could tell you

20    they're a more advanced user.

21          Even in file-sharing applications, what we look

22    for is, are all the settings on the user's computer the

23    default settings, indicating the user installed the

24    software by just hitting next, next, next, and didn't

25    change anything?  Or has that user gone in and actually

changed some settings to customize them?  It gives them a little bit higher knowledge of that software, what's going on.

Q.   And in this case, in viewing the computer that's related to Mr. Crowe, do you have an opinion as to his level of sophistication, at least with this computer?

A.   I mean, I didn't see anything that would indicate that he had a high level of computer knowledge. His FrostWire application, although I haven't completed my analysis of everything, appeared to be set in the defaults.  I didn't see anything customized.

Q.   Have you finished your evaluation of that program, as far as how things were set up?

A.   No.  I have not completed my forensic analysis in any way.

Q.   In part, is it because of simply proximity you have to the computer?

A.   Yes, absolutely.

Q.   In part, is it because of the need to have software to view it?

A.   Well, yes.  We came to this issue so I didn't continue with my analysis because we wanted to test the software.

Q.   Are there protective orders that this Court could put into place that would protect the software

1    itself for government use, while at the same time

2    allowing experts to look at it to determine the level of

3    its intrusion into a person's computer?

4        A.    Absolutely.   We work under protective orders

5    all the time for numerous reasons.

6        Q.    Were you able to determine in this case when it

7    was that anything was deleted on Mr. Crowe's computer?

8        A.    I have not done analysis on the deletion, no.

9    That is fairly time-consuming.

10       Q.    Were you able to make a determination as to

11   when the FrostWire program was even installed in the

12   computer?

13       A.    The FrostWire application appears for the first

14   time on February 2nd.   So, again, without doing a

15   complete analysis, it's my opinion that that's when it

16   was installed.

17       Q.    And so within a month's time or so, the

18   government is -- within about a month of the installation

19   of the program, the government is receiving information

20   about the activity.   Is that a fair statement?

21       A.    Correct, yes.   And actually I think it was

22   before that, because I believe it was March when the

23   Shareaza was actually used, and I believe that that

24   computer was identified prior to that by some other

25   software that we're not sure.

1       Q.   Okay.  Is there any literature that's been

2  provided to non-police officers that describes the scope

3  of the computer programs of GnuWatch or Peer Spectre or

4  anything else that CPS is using?

5       A.   No.  It's under pretty tight wraps.

6       Q.   Is there any analogy that you can -- why would

7  it be necessary in this field to get the software to

8  analyze it?  Are there analogies you can draw from other

9  fields that -- where it's been allowed in those things

10 that would make any sense to you?

11      A.   Well, again, forensics is a scientific field.

12 Computer forensics is no different than body forensics in

13 the fact that things need to be tested, evaluated, and

14 validated.  You talked about the DUI, the breathalyzer.

15 I actually worked with an attorney who challenged the

16 breathalyzer software.  It's very much the same thing.

17           You know, we were supposed to just believe that

18 the breathalyzer software worked properly, and that it

19 didn't -- there were no problems with it.  And as it

20 turned out when it was finally able to be tested, there

21 were problems with it.  And it was based on, you know,

22 again, years of cases where they believe that this

23 breathalyzer software had problems.  When they finally

24 got to test it, they realized that it did have problems.

25 I don't see this as being any different than that.

```
 1              MR. RION:  Thank you very much.
 2              THE COURT:  Thank you.  You may cross-examine.
 3              MS. REES:  Thank you, Your Honor.
 4                        CROSS-EXAMINATION
 5    BY MS. REES:
 6         Q.   Good evening.  Is it Loehrs?
 7         A.   It's Loehrs.
 8         Q.   I knew I was mispronouncing it.  You said you
 9    were a certified computer expert?
10         A.   Yes.
11         Q.   Is that a self-title you've given yourself?
12         A.   No, that's a certificate that I got.  I took
13    the -- I took the classes and the test, it's called a
14    CCFE.  It's a certificate.
15         Q.   Okay.  Would you agree that to be a certified
16    computer forensic examiner, in that field, there's no
17    specific classes an examiner must take?  There's no
18    standard credentials to be a certified computer expert?
19         A.   Well, to be certified, I think you have to have
20    a certificate in whatever you're being certified in.
21         Q.   Who certifies you?
22         A.   For the CCFE?
23         Q.   Correct.
24         A.   That was -- oh.  I think it was through
25    InfoSec?
```

1      Q.   Okay.  To be a computer forensic examiner, you

2   don't need to be certified, do you?

3      A.   Oh, no.  Anyone can call themselves a computer

4   forensic examiner.

5      Q.   But you look to the requisite training you've

6   had to determine if you, in fact, are a computer forensic

7   examiner, correct?

8      A.   Yes, I looked at training and certificates.

9      Q.   How many examinations have you done that

10   involved P2P investigations similar to using Shareaza LE?

11      A.   I don't know the total number.  It's probably

12   somewhere between 30 and 60.

13      Q.   And in these 30 to 60 cases, do you know of any

14   case where the evidence suggests the government's use of

15   Shareaza LE went beyond the publicly available program

16   and was able to search in greater capacity?

17      A.   Not specifically.  Shareaza LE, no.

18      Q.   So you have no case that suggests that Shareaza

19   LE, in your 30 to 60 cases that you've examined, not one

20   suggests that Shareaza LE somehow encroached or went

21   beyond the publicly available file-sharing program.

22      A.   Not specifically, no.

23      Q.   Now, I understand that you said you need to

24   test the computer program like Shareaza LE.  In these 30

25   to 60 cases that you've previously testified in, did you

1    ever seek a court order to access software such as

2    Shareaza LE, Peer Spectre, GnuWatch, or CPS?

3         A.   Many times, yes.

4         Q.   Have you ever been granted that court order?

5         A.   I have a -- I participated in a hearing in

6    Phoenix on this issue asking to test Peer Spectre and

7    several other that's part of the suite, I guess, of

8    software.  The judge has -- it's currently, it's active.

9    He hasn't made a decision yet.

10        Q.   Okay.  Have there been cases that there have

11   been decisions?

12        A.   Not that I've been involved in.

13        Q.   To your knowledge, has any computer examiner

14   ever been allowed access to software such as Peer Spectre

15   GnuWatch, Shareaza LE, or CPS?

16        A.   Not non-law enforcement, not that I'm aware of.

17        Q.   Now, you talked about a particular case in Ohio

18   where the file had been deleted but it was subsequently

19   downloaded using peer-to-peer?

20        A.   No, no.  It was identified by Peer Spectre as a

21   file name and a SHA value available for sharing.  It was

22   never actually downloaded.

23        Q.   Okay.  Did I understand correctly that file was

24   later determined to be deleted?

25        A.   That's correct.

1        Q.    So just so we're clear, if I try to download
2    something, I can't actually download a file that has been
3    deleted?
4        A.    Absolutely not.
5        Q.    And the fact that you found evidence through a
6    SHA value or the file name, that suggests to you the file
7    once existed, correct?
8        A.    Correct.
9        Q.    So, if we're here looking for evidence of child
10   pornography for a search warrant and we have things like
11   file names, would you believe that certain file names are
12   evidence of child pornography-related conduct?
13       A.    No.
14       Q.    You wouldn't?
15       A.    Not necessarily.
16       Q.    Okay.  Well, let's talk about SHA values.
17   Would you agree that SHA values can be evidence of child
18   pornography-related conduct?
19       A.    They can be.
20       Q.    Okay.  Let's talk about if I go into a
21   peer-to-peer file sharing program and I see a large
22   volume of files that suggest child pornography, doesn't
23   that indicate to you that a person has an interest in
24   child pornography?
25       A.    If you go in and see a large volume of nothing

1    but child pornography names, probably it's -- that's

2    probably indicative of somebody who knows they're getting

3    child pornography.

4        Q.   Okay, great.  And if I actually download files

5    from somebody and they are in fact child pornography, I

6    actually see it, doesn't that indicate to you there's

7    evidence of child pornography on that computer?

8        A.   Yes.

9        Q.   And that was the situation in this case,

10   correct?

11       A.   Two files were downloaded that identified as

12   child pornography, yes.

13       Q.   So there was reason for New Mexico State Police

14   to believe that child pornography existed on Mr. Crowe's

15   computer, correct?

16       A.   Yes.

17       Q.   What's that name of the Ohio case that you're

18   referring to?

19       A.   I believe it was Dillen.

20       Q.   D-I-L-L-A --

21       A.   D-I-L-L-E-N.

22       Q.   And was it a state or federal case?

23       A.   State.

24       Q.   Do you know which county?

25       A.   Cuyahoga County, I believe.

1     Q.   Are you aware that Shareaza LE has been beta

2  tested?

3     A.   I heard testimony.

4     Q.   Okay.  Is beta testing a form of scientific

5  testing, based upon your training and experience, to

6  insure accuracy?

7     A.   No, because it's got to be, it's got to be

8  tested by -- I mean, it's got to be tested by both sides.

9  You can't just --

10    Q.   I'm not asking if it has to be tested by both

11  sides.  I'm asking, is beta testing a way to insure that

12  something is accurate?

13    A.   I don't know what's involved in their beta

14  testing.  I would have to know more details about what

15  their beta testing involved.

16    Q.   Let's presume for sake of argument that the

17  beta testing showed there was no difference between

18  Shareaza LE and the publicly available file-sharing

19  program.  Does that suggest scientific reliability?

20    A.   No, because even the publicly available

21  software has issues.  So, no.

22    Q.   All right.  What did you -- what materials did

23  you review prior to your examination?

24    A.   I had -- and again, I'm not sure about

25  everything.  I know I reviewed the indictment.  I

1   reviewed a couple of police reports, but I didn't have

2   them all.  I reviewed a couple of search warrants.

3        Q.   Did you review the New Mexico State Police

4   search warrant?

5        A.   Yeah, I believe -- I had two search warrants.

6        Q.   Let's be clear here.  You actually have it in

7   front of you, but I'll just hand it to you.  It's

8   Government's Exhibit S-7.  Please look at that and tell

9   me if that's the search warrant that you reviewed.

10       A.   Yes, that looks like it.

11       Q.   So you had this prior to your examination?

12       A.   Correct.

13       Q.   And you said after your examination, you

14  received subsequent materials from defense.  What, if

15  anything, did you receive after the fact?

16       A.   I don't know.  There's a lot of stuff.  I have

17  no idea what all of that is.

18       Q.   Okay.  Can I have that back, please?  Thank

19  you.

20            When did you begin your examination?

21       A.   When was I here.

22       Q.   Last month?

23       A.   I believe so.  Yeah, it was in April, yes.

24       Q.   How many days did your examination last?

25       A.   I was only here for a couple days.

1        Q.    How many hours a day would you spend examining

2   the media?

3        A.    I'm usually there all day.

4        Q.    So, 8:00 to 5:00?

5        A.    Yeah, whatever they allow me.

6        Q.    Ever take a break?

7        A.    I use the restroom.

8        Q.    Okay.  Take lunch?

9        A.    No.  I usually go grab something.  Sometimes I

10  grab something to eat, sometimes I don't.

11       Q.    So, let's say you spent approximately what, 16

12  hours, 17 hours reviewing the evidence?

13       A.    Correct.  In front of the evidence, yes.

14       Q.    Okay.  And would you agree that a forensic

15  examination is -- it's tedious and methodical?

16       A.    Very.

17       Q.    There's a lot of information in computers?

18       A.    Yes.

19       Q.    And relevant evidence, you agree, could be

20  located anywhere on that computer?

21       A.    Absolutely.

22       Q.    And your job as the examiner is to try to find

23  relevant evidence, correct?

24       A.    Yes.

25       Q.    You don't want to inadvertently overlook

1  pertinent or relevant evidence?

2       A.   Absolutely.

3       Q.   And can I presume you conducted a thorough

4  examination?

5       A.   Oh, there's no way I could conduct a thorough

6  examination in two days.

7       Q.   So is it fair to say you could have missed

8  relevant pieces?

9       A.   Absolutely.

10      Q.   Things like the files that were actually

11 downloaded?

12      A.   Yes.

13      Q.   Okay.  Will you concede that you missed those

14 files?

15      A.   Yes.  He said they were in the cache and I

16 didn't run any forensic processes so I couldn't possibly

17 have seen them.

18      Q.   I understand.  Now, you said in the course of

19 your examination, you look for levels of sophistication

20 of the user.  Correct?

21      A.   Yes.

22      Q.   I want to be clear.  When you do your

23 examination, that only tells you the manner the computer

24 was at the time of seizure, correct?

25      A.   Yes.

     1       Q.   Okay.  It doesn't tell you exactly what the
     2   settings are when law enforcement originally noticed this
     3   computer in March of 2011, does it?
     4       A.   You can go search for the props files in
     5   unallocated space and try to get props files from back on
     6   that date, but again, I haven't been able to run the
     7   processes.
     8       Q.   And I heard you say the word "try."  There's no
     9   guarantee you can find those files?
    10       A.   Well, there's never a guarantee in forensics.
    11       Q.   People can delete files, correct?
    12       A.   Oh, absolutely.
    13       Q.   People can wipe files?
    14       A.   Yes, they can.
    15       Q.   People can turn off programs?
    16       A.   Yes.
    17       Q.   People can update programs?
    18       A.   Yes.
    19       Q.   So user settings can change?
    20       A.   Yes.
    21       Q.   And so your opinions only relate to the
    22   computer at the time of the seizure, correct?
    23       A.   Correct.
    24       Q.   Your opinions do not relate to at the time New
    25   Mexico State Police conducted their investigation?

1      A.    Correct.

2      Q.    Now, you talked about the level of the

3 sophistication.  Did you know that Mr. Crowe had actually

4 renamed files?  Did you see that anywhere in the

5 investigation?

6      A.    I don't know.

7      Q.    You don't know?  You don't recall?

8      A.    I mean, everyone renames files.

9      Q.    Did you know that Mr. Crowe had actually

10 spliced videos to create a video of different -- of

11 stepdaughters apparently he was filming?

12      A.    I'm not aware.

13      Q.    Did you know Mr. Crowe had changed user

14 settings?

15      A.    I am not sure, again.

16      Q.    Did you know Mr. Crowe had updated his software

17 to turn off file sharing?

18      A.    I don't know he did that.

19      Q.    Do these things, assuming they're true, suggest

20 to you some level of sophistication?

21      A.    Not necessarily.

22      Q.    Now, in your report, or in your affidavit I

23 guess I should say, it suggests to me as a reader that

24 you believe New Mexico State Police simply initiated

25 their investigation based upon analyzing SHA values.  Was

1    that your initial impression?

2        A.   I was very unsure about what they did based on

3    the affidavit and, again, the government's response to

4    the motion.  I wasn't sure if files had actually been

5    downloaded, or they talk about -- they talk about file

6    listings.  So to be honest with you, I wasn't sure and I

7    didn't see any logs.

8        Q.   Okay.  So, when you look at the affidavit, when

9    it says, "On each of these dates, the software was able

10   to log and directly download a file from the suspect

11   computer," there's some misunderstanding with the words

12   "directly download"?

13       A.   Yeah.  Again, maybe it's me as a forensic

14   expert, I'm looking for documentation of evidence of it.

15       Q.   Again, let's talk about documentation of

16   evidence.  I understand you might want to look at logs.

17   But going back to the search warrant, if you again read

18   on, it says, "Affiant also examined the logs in reference

19   to the files which had been downloaded from the suspect's

20   computer.  Affiant noted the following information for a

21   file downloaded."

22            So is there -- is there a discrepancy in that

23   use of the term "downloads," and then the subsequent

24   images that were described?

25       A.   Yeah.  I guess I don't trust anything unless I

1  see it.  If they talked about logs, I was wondering why

2  no logs had been provided.

3       Q.   So you don't trust the work of law enforcement?

4       A.   No, it's not that at all.  I don't trust

5  anything until I've seen the actual evidence.  That's me

6  as a forensic expert.

7       Q.   You do understand this is a sworn affidavit,

8  correct?

9       A.   Oh, I do.

10      Q.   Somebody went before a judge and said, I swear

11  the whole contents are the truth?

12      A.   Yeah, seen it a lot.

13      Q.   And so even though it's sworn, you still didn't

14  take it at its face value?

15      A.   I did not see documentation of downloads,

16  that's all I can tell you.  That's what I was looking

17  for.

18      Q.   Okay.  And you're aware when law enforcement

19  downloads from a suspect's computer, it's a direct

20  download, correct?

21      A.   Well, it depends on the law enforcement officer

22  and the investigation.  I've heard testimony on all kinds

23  of cases about different undercover investigations and

24  downloads.

25      Q.   Okay.

1      A.    They're not always direct.

2      Q.    Are you aware that law enforcement sometimes

3  has the capabilities to directly download from a subject?

4      A.    Yes.

5      Q.    Okay.  And so, assuming that to be true, and

6  assuming law enforcement actually received a download,

7  there's no way those files could have been corrupted,

8  unable to be opened, partial, anything of that nature,

9  correct?

10     A.    Well, that's not true, because you can directly

11 download -- again, we've tested it.  I can directly

12 connect to a user's computer and download an incomplete

13 file, a partial file, a corrupted file.  So, yes, that

14 can be done.

15     Q.    I didn't ask if it can be.  If there's evidence

16 in this case to suggest that law enforcement actually

17 downloaded two files and they physically looked at the

18 files and described them, that does not indicate those

19 files which they downloaded were corrupted, partial,

20 unable to be opened, or unable to be viewed.  Correct?

21     A.    For those two files, that's correct.

22     Q.    Okay.  Now, you said you examined the

23 FrostWire.props file on Mr. Crowe's computer?

24     A.    Yes.

25     Q.    And again, the data in the FrostWire.props file

1  was only as it was -- or you can only testify as to it

2  was configured at the time the search warrant was

3  executed, correct?

4       A.   Correct.

5       Q.   You cannot testify how it was configured at the

6  time New Mexico State Police conducted their

7  investigation, correct?

8       A.   Not with that particular file, that's correct.

9       Q.   Okay.  So you would agree that the data within

10  a FrostWire.prop file can change?

11       A.   It can.

12       Q.   So, hypothetically, if I download an image or

13  if I share my files today, New Mexico State Police

14  catches me and I turn it off tomorrow, you wouldn't

15  necessarily find evidence of that sharing, correct?

16       A.   I may.

17       Q.   But you may not.

18       A.   I may not.

19       Q.   Okay.  And in a similar comparison, if I

20  designate a particular folder as sharing today, and

21  change that folder to a different sharing folder

22  tomorrow, you may not find that original file in the

23  FrostWire.props, correct?

24       A.   That is correct.

25       Q.   So the fact that a file was not found in the

1  FrostWire.props at the time of your examination does not

2  mean it wasn't being shared when New Mexico State Police

3  conducted their investigation, does it?

4      A.   I have no evidence of that.  I have no opinion.

5  I have no evidence that shows it was shared.  I only have

6  evidence that shows it wasn't, that's all.

7      Q.   So as you sit here on the stand, you cannot say

8  it was not shared?

9      A.   I have no evidence that it was in a shared

10  location, that's all I can tell you.

11      Q.   That was at the time of your examination.

12      A.   Correct.

13      Q.   But you cannot speak as to what happened in

14  March of 2011?

15      A.   Nobody knows what happened in March of 2011,

16  that's correct.

17      Q.   So those files absolutely could have been in a

18  shared folder which Mr. Crowe designated?

19      A.   Again, I found no evidence of that.

20      Q.   So the answer is, yes, they could have been,

21  correct?

22      A.   It's possible.  Anything's possible.

23      Q.   Now, according to your sworn affidavit, you

24  forensically examined numerous computers using FrostWire.

25  Correct?

1     A.   Correct.

2     Q.   And you've also researched, downloaded, and

3 tested most versions of FrostWire?

4     A.   Correct.

5     Q.   And have you researched, downloaded, and tested

6 version 4.21.3?

7     A.   I don't know.  Again, I'd have to go to the lab

8 and see all the materials we have.

9     Q.   Do you know if you've researched, downloaded,

10 and tested 4.21.6, which you found on Mr. Crowe's

11 computer?

12     A.   Again -- actually, I think we have actually

13 tested the .6 version.

14     Q.   Okay.  And you said you read documentation

15 prepared by FrostWire?

16     A.   Yes.

17     Q.   You posted on their websites?

18     A.   No, I haven't posted on their websites.  We've

19 been on their knowledge base.

20     Q.   Okay.  You participated in message boards,

21 things of that nature?

22     A.   Yes.

23     Q.   And you've given presentations about FrostWire?

24     A.   Yes.

25     Q.   On a scale of one to ten, one being no

experience and ten being completely knowledgeable, how

would you rate your expertise regarding FrostWire?

      A.    Oh, I have no idea.  I know it fairly well, but

I couldn't possibly know everything.  I don't know.  I

hate -- I don't know what, to give you a six, a seven, an

eight.  I have no idea.

      Q.    A six, seven, eight, let's go with that.  Would

you agree that FrostWire version 4.21.6 is a more recent

update than FrostWire 4.21.3?

      A.    Absolutely.

      Q.    And so does that suggest to you that if 4.21.3

was originally seen at the time of the initial

investigation, and 4.21.6 was seen at the time of the

later -- at the time of the examination, that software

was in fact updated?

      A.    That's correct.

      Q.    Now, you also said that 4.21.6 was installed on

the defendant's computer in February 2nd, 2011.  Did I

understand that correctly?

      A.    That's bad wording.  The software was installed

February 2nd, the version on his computer is 4.21.6.

Again, having completed my analysis, I have no reason to

dispute that 4.21.3 was the one originally installed on

the 2nd.

      Q.    So that might just be a typographical error in

1    your affidavit?

2         A.    No, it's combining the install date of

3    FrostWire with the version that's currently on there.

4    It's poorly worded.

5         Q.    Fair enough, I do it all the time.

6               Now, you were also concerned because the New

7    Mexico State Police originally identified the P2P program

8    as LimeWire 4.21.3?

9         A.    Correct.

10        Q.    Okay?  Would you agree that FrostWire is a

11   modification of LimeWire?

12        A.    It says it's not, but I believe it is.

13        Q.    Okay.  So, under the guise of you believe it

14   is, essentially what we're saying is FrostWire takes a

15   lot of the data codes of LimeWire and they may modify it

16   or tweak it to whatever their interest is?

17        A.    Correct.

18        Q.    Do you have anything to suggest that what

19   Sergeant Pilon testified to either this morning or early

20   afternoon, that anything to negate the suggestion that,

21   although the peer-to-peer software was identified as

22   LimeWire, it was actually FrostWire?

23        A.    No, I have no reason to negate that.

24        Q.    In all of the P2P investigations that you have

25   participated in, so 30 to 60 similar to this case, is

1  child pornography found in most of those investigations?

2       A.    Oh, that's what they're about.

3       Q.    So, you'd say yes?

4       A.    In some form or another.

5       Q.    So, based upon that, when you have an

6  investigation similar to this, it's absolutely reasonable

7  and reliable to believe that there's evidence on that

8  computer related to child pornography, correct?

9       A.    Well, yes.

10      Q.    Okay.

11            MS. REES:  Nothing further, Your Honor.

12            THE COURT:  Redirect?

13            MR. RION:  Just briefly.

14                    REDIRECT EXAMINATION

15 BY MR. RION:

16      Q.    If I understand correctly, you not only found

17 the title for those two images, but you also found a

18 pathway?

19      A.    Correct.

20      Q.    That pathway, did it appear to be written over

21 or adulterated?

22      A.    No.

23      Q.    And through that pathway, did you find any

24 evidence it had ever been in a shared space?

25      A.    No.

```
1        Q.   Now, you're not here to say that the government
2   didn't have probable cause to search the computer,
3   correct?
4        A.   No.
5        Q.   You're here to express an opinion about the
6   need to view the instrumentality for gaining that
7   probable cause.
8        A.   Correct.  I question the tools being used in
9   the very beginning that are identified in these
10  computers.
11       Q.   Are you aware of any testing that was done on
12  any of this software by independent parties, including
13  those that wouldn't have an interest in law enforcement?
14       A.   No.
15            MR. RION:  Thank you.
16            THE COURT:  Is there anything further?
17            MR. RION:  Not of this witness.
18            THE COURT:  Thank you very much for your
19  testimony.  You may step down.
20            MR. RION:  Your Honor, it's my memory that the
21  expert, Sergeant Pilon, testified that he knows they
22  received the information from other organizations, but
23  was not aware as to the software that they utilized to
24  gain that information.
25            That's -- I just want to make sure that that
```

1   was everyone's understanding.  I wanted to recall him for

2   that specific question.  If that seemed to be the answer

3   that was given, then I need not recall him as a witness.

4           THE COURT:  That was your testimony, was it not

5   sir?

6           SERGEANT PILON:  Yes, it was, Your Honor.

7           THE COURT:  Thank you.

8           MR. RION:  With that, the defense has no other

9   witnesses, Your Honor.

10          THE COURT:  All right.  It is late, I'm not

11  going to request closing statements.  If you wish to

12  prepare something in writing, you're both welcome to do

13  it simultaneously.  And I'll give you -- I think five

14  days is reasonable.  Otherwise, that should conclude it.

15  That concludes the evidence by both parties.  Thank you

16  very much for the presentation.

17          There is nothing further?

18          MR. RION:  I guess we're resting subject to the

19  Court's determination of the software issue.  We filed a

20  motion asking for --

21          THE COURT:  You didn't file a motion.  There

22  was a reply.  There's no motion.

23          MR. RION:  I thought that we had a branch in

24  our -- asking the Court to --

25          THE COURT:  It's not how we do things anywhere.

1    All right?  The reply doesn't give the government an

2    opportunity to even respond.  You want to file a

3    pleading, file a pleading.  File it, indicate what it is

4    you're requesting, file authority, and give the

5    government an opportunity to respond.

6            But a reply is not a motion for discovery, it's

7    not a motion to compel, it's nothing.  It doesn't even

8    give the government an opportunity to respond.  A reply

9    is -- that's the end of it.

10            MR. RION:  Okay.  Sorry.  We combined it.  I

11   think it's a separate branch, I don't think it's in the

12   reply itself.  Okay.  I'll file something.

13            THE COURT:  Am I mistaken?  What's a separate

14   branch?  What are you talking about?

15            MR. RION:  It was my understanding that we

16   replied and then requested that information.  But it

17   wasn't intended to be -- it was intending to be a

18   request.  If the Court wishes me to file a separate

19   pleading, I will.  But that was the intent of it and that

20   was sort of the spirit of what we were seeking today.

21   So --

22            THE COURT:  It was in your reply, was it not,

23   or was there a separate document?

24            MS. REES:  It was in the reply, Your Honor.

25   You are correct in your recollection.

1          THE COURT:  All right.  So, is there anything

2   further on this matter?

3          MR. RION:  Well, subject to, I guess, the reply

4   I'll put into another memorandum, that would be the only

5   thing.

6          THE COURT:  All right.  Thank you very much,

7   everyone, for your presentations.  We will be in recess.

8          MS. REES:  Your Honor, just real quickly, you

9   said five days?  I'm sorry.  I didn't hear you.

10          THE COURT:  Yes.  I'm going to take this matter

11   under advisement, but if you'd like to make closing

12   arguments in writing, I'd like them simultaneously, and

13   you will have five days to do so.

14          MS. REES:  So until next Thursday?  Until next

15   Thursday.

16          THE COURT:  Next Thursday will be fine.  Thank

17   you very much, everyone.  We'll be in recess.

18          (Proceedings in recess at 5:49 p.m.)

19

20

21

22

23

24

25

1

2                    REPORTER'S CERTIFICATE

3

4        I, SUSAN B. SPERRY, do hereby certify that I did

5    report in stenographic shorthand the proceedings as set

6    forth herein, pages 1 through 51, inclusive, and that I

7    was an Official Federal Court Reporter at that time.

8            WITNESS MY HAND AND SEAL this 12th day of May, 2012.

9

10

11                    _____

12                    Susan B. Sperry, RDR, CRR, CBC

13

14

15

16

17

18

19

20

21

22

23

24

25